# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CR417-218 |
| | ) | |
| JHONATHAN RANGEL, | ) | |
| | ) | |
| Defendant. | ) | |

FILED
Scott L. Poff, Clerk
United States District Court

By James Burrell at 9:58 am, Jan 18, 2018

## REPORT AND RECOMMENDATION

This case involves a challenge to the validity of a search warrant issued by a state magistrate to officers conducting a murder investigation in Effingham County, Georgia.  Defendant Jhonathan Rangel, an illegal alien charged with the unlawful possession of a pistol seized during the execution of that warrant, contends that the warrant violated the Fourth Amendment by failing to particularize his residence as a place to be searched and by failing to set forth a probable-cause basis for the search. Doc. 27. His post-arrest statements to law enforcement, he further contends, must be suppressed as the fruit of this illegal search.  *Id.* Because the warrant specifically and clearly described each of the multiple dwellings that the magistrate authorized to be searched, including the mobile home where Rangel had a bedroom, Rangel's

1

particularity challenge is utterly without merit.  His attack on the probable cause underpinnings of the warrant fails to acknowledge the deferential standard of review that this Court must utilize when assessing the warrant's validity.   Under the appropriate "great deference" standard, *Illinois v. Gates*, 462 U.S. 213, 236 (1983), the warrant affidavit provided a "substantial basis" for the state magistrate's finding of probable cause to search the property described in the warrant.  Even if the state magistrate erred, however, the officers had an objective, good faith belief that the warrant was valid both when it was issued and when it was executed.  Because the underlying search was proper, his further motion to suppress any statements made to law enforcement as the tainted product of an illegal search should also be denied as moot.

## I.   FACTS

The essential facts are not in dispute.[1]  On August 19, 2017, Garden City police officers discovered the lifeless body of Eliud Montoya, who had been shot in the back of his head and in his back by a small-

---

[1]  The Court's discussion of the facts is drawn from the search warrant affidavit (the veracity of which is unchallenged by defendant), the unrebutted suppression hearing testimony of the police detective who presented that affidavit and oversaw the execution of that warrant, and the various exhibits offered by the parties at the suppression hearing.

caliber weapon.  Detective Roberto Rodriguez, a Chatham County Officer and the lead homicide investigator, soon identified Pablo Rangel ("Pablo") and his nephew, Refugio Ramirez, as the chief suspects.  Det. Rodriguez then prepared a warrant affidavit seeking authorization to search certain property owned by Pablo in Effingham County, Georgia. The detective had a police sergeant and a police captain "proofread" the affidavit, and he conferred with an assistant district attorney, who opined that there was sufficient probable cause to seek a warrant.  Later that same evening, Det. Rodriguez called an Effingham County Magistrate and arranged to meet with her the next morning, a Saturday. During their brief meeting, the detective supplemented his written affidavit with certain sworn, but unrecorded, oral testimony, which is permissible under Georgia law.  *King v. State*, 263 Ga. 741, 743, 438 S.E.2d 620 (1994).

### A. Warrant Affidavit

Detective Rodriguez sought leave to search Pablo Rangel's rural, 26-acre property for guns, ammunition, shell casings, and other items

believed to be pertinent to the murder investigation.   Aff. at 1.[2]   He described the property to be searched as follows:

> 275 Milton Rahn Road, Rincon Georgia, 31326.   The residence and property can be reached by traveling on Rahn Station Road from Highway 21 for 2 miles making a left onto Milton Rahn Road and traveling 1.2 miles and the residence (tan in color) will be located on the left following [sic] by the mobile home (gray in color).   See Exhibit A and B.
>
> Property is owned by Pablo Rangel.   Property is listed with having 26.65 acres.  Land has multiple dwellings that can not be accessed without driving on a private drive that dead ends on this land.   Residence has a newer structure identified as a modular home, as well as multiple trailers as follows.  Gray in color mobile home with white trim located at the far end the driveway.  Light colored pull behind camper located in the rear of the gray mobile home, tan in color residence with wooden porch on the back located before reaching the gray mobile home. There are currently 8-10 vehicles on the property.

Aff. at 1.[3]

---

[2]  The warrant affidavit appears at various locations in the record, as it was attached to both parties' pre-hearing briefs (doc. 27-1; doc. 32, ex. A) and introduced by both as an exhibit during the suppression hearing.  For convenience, the Court will simply cite to the affidavit as "Aff." and to the search warrant as "Warrant," using the handwritten numbering scheme that appears at the bottom of each document (*e.g.*, "1 of 4").

[3]  Detective Rodriguez set out the property description passage in both his affidavit and the proposed search warrant using bold, uppercase lettering.  He used similar emphasis in other sections of his warrant application.  Unless otherwise noted, the Court will use standard, unemphasized capitalization when quoting from the affidavit and search warrant.

On the next two pages, Det. Rodriguez set out the facts offered in support of a probable cause finding.  In brief, those facts were these:

- The previous day, August 19, 2017, someone had murdered Eliud Montoya by shooting him once in the back of the head and twice in the back.  Aff. at 2, 3.

- The gunshot wounds appeared to have been inflicted by a small caliber (possibly a .22 caliber) weapon.  *Id.* at 3.  Montoya, whose nose had also been broken, did not exhibit any wounds suggesting that he had fought with his assailant.  *Id.* at 3.

- Montoya appeared to have been working on a large tree-service work truck at the time of the murder.  *Id.* at 2.  The investigators saw no evidence that Montoya had been robbed, for his personal vehicle was parked next to the work truck and no items appeared to be missing.  *Id.* at 3.

- Montoya's mother arrived at the scene and informed Det. Rodriguez that Montoya's boss, Pablo Rangel, had killed him.  *Id.* at 2.  She reported that the two men had had a falling out at work on August 17, 2017.  She stated that Montoya had filed a complaint against Rangel with the Equal Employment Opportunity Commission (EEOC), and that there were documents that would support her statement.  *Id.*

- When Det. Rodriguez interviewed Montoya's wife at their nearby residence, she independently confirmed the information furnished by his mother.  *Id.*  She also furnished documentation reflecting his employment by Wolf Tree Experts, as well as a manila envelope from the EEOC containing four legal statements from that company's employees, including one by Montoya.  *Id.*  Those statements advised the EEOC that the employees were in the United States illegally and that they had been mistreated and taken advantage of by their supervisor, Pablo Rangel, who withheld some of their pay.  *Id.*  Inside Montoya's vehicle the investigators

found further documentation reflecting a work conflict between Montoya and Pablo. *Id.* at 3.

- Joel Reyes, one of the EEOC complainants accusing Pablo Rangel of mistreatment, confirmed the truthfulness of his notarized statement to the EEOC. *Id.* at 3. He advised that Pablo would provide the employees with a Social Security Number and phony personal identifiers so that they could be added to the company payroll. *Id.* Pablo did not want Montoya to share this information with anyone. Reyes had warned Montoya to leave Pablo alone, for he was going to have him killed. *Id.* Reyes did not believe that Pablo Rangel would kill Montoya but that he had family members who were willing to do so. *Id.*

- The investigators learned that Refugio Ramirez, one of Pablo Rangel's nephews, lived in a trailer on Pablo's property. *Id.* at 3. A 2014 police report revealed that Ramirez had been arrested for possession of a concealed weapon, a .22 magnum SuperX pistol. *Id.* Ramirez, who worked with the same tree service company as the murder victim, currently had an outstanding arrest warrant from Chatham County.[4]

The search warrant that Det. Rodriguez prepared reflected the same property description as the warrant affidavit. Warrant at 1. Again, that property description stated that Pablo Rangel's 26.65-acre tract could "not be accessed without driving on a private drive that dead ends on this land." *Id*. When the detective appeared before the magistrate, he testified under oath that he had been unable to view Pablo's property

---

[4]   The final sentence of the paragraph discussing "Refugo [sic] Ramirez" actually says that "Eilud" had warrants out for his arrest. *Id.* at 3. Det. Rodriguez testified at the suppression hearing, however, that he "verbalized" to the state magistrate that it was Refugio who was wanted by the police.

himself, because he had been assured by local officers that anyone driving down the secluded private drive would certainly be spotted, thus tipping the investigators' hand.  Instead, he relied upon information furnished by Effingham County deputies who had previously been on the property.  The detective further explained to the magistrate that he was seeking authorization to search each of the structures and vehicles mentioned in the property description, for he believed that the items to be seized (weapons, ammunition, etc.) could be concealed in any of those places.  The magistrate issued the requested warrant at 11:23 a.m. on August 20.

## B. Execution of the Search Warrant

Immediately after obtaining the warrant, Det. Rodriguez met with the assembled search team of around twenty officers and explained the purpose of the search.  He showed them photographs of both Refugio Ramirez and another individual who were believed to be on the property and who both had outstanding arrest warrants.  Each member of the entry team was assigned to search one of the multiple structures located on the property.

The agents arrived at the property between 12:00 and 1:00 p.m., on a day when the temperature approached 100 degrees. During the next three to four hours, the agents searched all the structures and vehicles on the property. During the course of that search, they seized numerous firearms, a variety of ammunition and shell casings, and other evidence. Gov't Ex. 14. While the agents encountered and arrested Pablo Rangel, neither Refugio Ramirez nor the other person wanted by the authorities was on the property at the time of the search.

Firearms were found in in the gray mobile home, including an "AR 15 style rifle" with a scope and grip attachment, a "new 1911 style handgun with a wooden grip," and a "paint ball style rifle" in a bedroom identified as belonging to Jhonatan Rangel. *See* CR417-217, doc. 39-1 at 6-7 (post-search investigator report). A "yellow long sleeve shirt and blue jeans with a lot of dried blood" were also found in his bedroom. *Id.* Defendant was not present at the execution of the search, but his passport was recovered. Doc. 27-2 (Homeland Security Report) at 2. Several days after the search, agents encountered defendant in Savannah and took him into custody for a formal interview, where he was *Mirandized* and questioned. *Id.*

8

## II.   ANALYSIS

### A. Particularity Challenge

Defendant's particularity argument rests upon a fallacy -- that Det. Rodriguez sought permission to search, and the warrant allowed him to search, only the "tan in color" modular home where Pablo Rangel resided.  Doc. 27 at 4.  But such a limited search of that single residence was neither requested by the detective nor authorized by the state magistrate.  In his affidavit, Det. Rodriguez stated that he had reason to believe that evidence pertinent to the murder of Montoya was located at "275 Milton Rahn Road," which was the address of the 26.6 acre tract owned by one of the chief suspects, Pablo Rangel.  Aff. at 1.  The affidavit carefully described the "multiple dwellings" on that property, *id.*, and it revealed that another key suspect lived in a trailer on the property.  *Id.* at 3.  Those dwellings consisted of a newer "modular home" as well as a "gray in color mobile home with white trim" located past the modular home, and a "light colored pull behind camper" located behind the mobile home.  Aff. at 1.

Only a strained reading of the warrant's lengthy description of the places to be searched will support defendants' argument that "275

Milton Rahn Road" could only mean Pablo Rangel's personal residence. First, neither the warrant affidavit nor the warrant itself ever identifies the tan-colored modular home as Pablo's personal residence, and Det. Rodriguez testified that he did not confirm (though he suspected) that Pablo resided there until after the search. Second, Pablo was not the only suspect believed to reside at his compound, for Refugio Ramirez reportedly lived in one of the "trailers" on that property and he was thought to be in possession of a .22 caliber pistol that possibly served as the murder weapon. Clearly, law enforcement wished to search that trailer. Finally, the warrant's property description contains this sentence: "*Residence* has a newer structure identified as a modular home, as well as multiple trailers as follows," and what "follows" is a detailed description of each of those structures. Warrant at 1 (emphasis added). This definitional passage makes clear that the use of the word "residence" was meant to encompass not just the modular home but the gray trailer and light-colored pull behind camper as well.

Furthermore, when he presented his warrant affidavit to the magistrate, the detective specifically informed her that he was seeking authorization to search *all the dwellings and vehicles* referenced in the

affidavit's property description, for he emphasized that evidence of the murder might be concealed in any of those places.  The magistrate then issued a warrant that contained the exact same property description as the warrant affidavit.  The command clause of that warrant directs the police to search the "property described above."  Warrant at 1.  Any reasonable officer (or judge) would have interpreted that warrant as allowing a search of each of the specifically-described structures, including the mobile home where defendant resided.

In the final paragraph of the affidavit, the detective states his firm belief that "the fruits of the crime due [sic] exist inside the residence located at 275 Milton Rahn Road."  Aff. at 2.  When read in isolation, that passage does suggest that there was but one residence at 275 Milton Rahn Road where evidence of the homicide might be concealed.  But when the affidavit is considered in its entirety, whether as originally drafted or as supplemented by the detective's sworn oral testimony before the magistrate, it becomes clear that the detective painstakingly described each of the multiple structures believed to be located at 275 Milton Rahn Road for a very good reason -- he was seeking to search them all.  And that is precisely what the state magistrate authorized him

to do.   Defendant's argument to the contrary depends upon a mischaracterization of both what the detective sought and what the magistrate allowed.

As it turns out, one of the dwellings on Pablo Rangel's property -- the gray mobile home where defendant had a small bedroom -- had the separate mailing address of 135 Milton Rahn Road.  Because the warrant did not specifically mention the 135 address in authorizing a search of the gray mobile home, defendant contends that the officers had no license to enter that dwelling.  This argument is simply wrong.

The Fourth Amendment particularity requirement is satisfied "if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended."   *Steele v. United States*, 267 U.S. 498, 503 (1925).  While it is common practice to identify the premises by street address (particularly in urban areas), there is no constitutional requirement that this be done.  2 WAYNE R. LAFAVE, SEARCH & SEIZURE § 4.5(a) at 711-12 (5th ed. 2012).[5]  All the Fourth Amendment requires is that the warrant's property description

---

[5]  As the LaFave treatise notes, the particularity requirement has a greater degree of flexibility in rural settings, both because such property "often does not lend itself to precise description" and "because the chances of error are somewhat less in a rural setting."  *Id.* at 712-13.

be sufficiently detailed as "to minimize the risk that officers executing [the warrant] will by mistake search a place other than the place intended by the magistrate." *Id.* at 711. The warrant in this case clearly met that objective. The warrant gave precise directions to Pablo Rangel's 26-acre tract and, specifically, to the multiple dwellings located on that property. Warrant at 1 (noting that the property could be reached by "traveling on Rahn Station Road from Highway 21 for 2 miles making a left onto Milton Rahn Road and traveling 1.2 miles," where the "tan in color" residence would be located on the left followed by the "gray in color" mobile home). The affidavit then referenced as exhibits two aerial photomaps showing the property's precise location. *Id.*, exs. A and B. The warrant's property description was so precise as to eliminate any possibility that the executing officers would search the wrong premises.

Not only was there no requirement that the gray mobile home be identified by its numeric address, the evidence at the suppression hearing established that there was no possibility that this could have been done, for Det. Rodriguez was unaware of the mobile home's "135" address either at the time he applied for the warrant or when he

executed that warrant.   Based on information gained from local Effingham County officers, Det. Rodriguez believed that the 275 Milton Rahn Road address applied to all of the structures on Pablo's property. The detective, who was conducting a rapidly unfolding murder investigation, had been unable to examine the property himself prior to the execution of the warrant for fear of alerting the suspects that they had become the focus of that investigation.   He reasonably relied upon local officers familiar with Pablo's property for both its proper address and for the description of the various structures on that property.

When the detective arrived at the property he immediately secured the modular home and then proceeded in a direct line from that residence to the gray mobile home, where he encountered a covered porch and entranceway.   Gov't Exs. 3-5.   At this point of entry, which the detective assumed was the main door of the premises, there was no identifying address or number of any kind.   *Id.*   Thus, when Det. Rodriguez entered the mobile home he was unaware that the number "135" had been affixed to the opposite side of that structure.   But even had the detective walked around the mobile home before gaining entrance (which may have been a foolhardy step under the

14

circumstances), the observation of the numbers would not have deprived him of the right to enter the premises.  He was in the possession of a warrant that particularly described, and specifically authorized the search of, the gray mobile home.  That was all he needed.

The Fourth Amendment states that no warrants shall issue except those "particularly describing the place to be searched."  The search warrant in this case did exactly that.  Defendant's particularly challenge is without merit and must be rejected.

### B. Probable Cause

Defendant next argues that the warrant affidavit failed to establish probable cause to search 135 Milton Rahn Road, though he appears to assume that the affidavit may have provided probable cause to search "the residence of Pablo Rangel."  Doc. 27 at 4.  Nothing in the warrant affidavit's probable cause statement, however, gave greater evidentiary emphasis to Pablo's personal residence than to any of the other dwellings (or vehicles) located inside his compound.  Indeed, the affidavit set forth information suggesting that it was Pablo's nephew, not Pablo himself, who was the likely triggerman.  There was a greater probability that the murder weapon, or ammunition associated with it, would be found in the

"trailer" where Refugio Ramirez resided than in Pablo's own home.  By asserting that Pablo's home is the only "residence" at 275 Milton Rahn Road, doc. 27 at 4, defendant is simply resurrecting a particularity challenge that the Court has already found lacking rather than making a direct attack on the affidavit's probable cause foundation.

This Court must employ an exceedingly deferential standard when reviewing the state magistrate's probable cause determination.  A reviewing court's task is not to make a *de novo* finding of probable cause but rather to decide whether the issuing magistrate -- whose assessment of the affidavit's factual presentation is entitled to "great deference" -- had a "substantial basis" for finding probable cause.  *Gates*, 462 U.S. at 236, 238-39.  Given the strong preference for warrant-based searches, a magistrate's "finding of probable cause should be sustained in doubtful or marginal cases."  *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977).

The state magistrate's probable cause determination clearly survives under this highly deferential standard.  Almost immediately after the police discovered a Hispanic male who had been subjected to an execution-style slaying, suspicion focused on Pablo Rangel, whom

multiple witnesses identified as having a strong motive for committing the murder.  Pablo was a businessman who dominated and abused his illegal-alien workforce, and he had amassed sufficient wealth to acquire a large tract of real estate.  Aff. at 1-3.  It was not unreasonable to infer that this powerful figure -- who had "family" willing to commit murder at his behest -- exercised full control over that secluded 26-acre property. Pablo's nephew, who worked with the victim, lived in one of the trailers on Pablo's property and was known to have been arrested several years earlier while in possession of a small-caliber pistol that matched the murder weapon.  There was then an outstanding warrant for the nephew's arrest.  Defendant does not contest a finding that those facts yielded probable cause to search *some part* of Pablo's 26-acre rural tract, but for reasons that are not precisely explained (other than a bogus particularity claim), he concludes that probable case was limited to Pablo's personal residence.  But probable cause may exist to believe that a particular item of evidence is concealed in more than one location, *Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 929 (3d Cir. 1974), and here the state magistrate had a substantial basis for her inference

that evidence of the murder might be concealed within any dwelling or vehicle at the compound.

"Reasonable minds frequently may differ on the question of whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Certainly, reasonable jurists might disagree on whether Det. Rodriguez' affidavit established probable cause to search all (or, for that matter, any) dwellings and vehicles on Pablo's property. But when the state magistrate's probable cause assessment is viewed charitably, as the "great deference" standard requires, it cannot be said that the facts presented were so insubstantial as to preclude any possible finding of probable cause to search the entirety of the estate. This warrant, therefore, survives defendant's probable cause challenge.

## C.    Good Faith

The judicially-crafted exclusionary rule does not apply where an officer acts in objective, good faith reliance upon a search warrant that is only later determined to be invalid. *Leon*, 468 U.S. 897 (declining to apply the exclusionary rule where officers had acted in reasonable reliance on a search warrant that was ultimately found to be unsupported by probable cause); *Massachusetts v. Sheppard*, 468 U.S.

981 (1984) (applying the good faith doctrine to a warrant that misstated the items to be seized).  After *Leon* and *Sheppard*, "searches conducted pursuant to warrants rarely require suppression," *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990), for "[i]n the ordinary case an officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.

Even in with-warrant cases, however, the exclusionary rule continues to apply in circumstances where the officer has "no reasonable grounds for believing that that warrant was properly issued." *Id*. at 922-23.  *Leon* identified four such situations: (1) where the officer misled the magistrate by intentionally or recklessly including false information in his affidavit, (2) "where the issuing magistrate wholly abandoned his judicial role" by failing to act in a neutral and detached manner, (3) where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and (4) where the warrant is "so facially deficient . . . in failing to particularize the place to be searched . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923.

Defendant does not reference the good faith doctrine, much less invoke any of these exceptions to that doctrine.   In applying that doctrine, the appropriate question is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 922 n.23.  This Court's earlier finding that the magistrate had a "substantial basis" for finding probable cause would certainly suffice to establish that the detective had a good faith belief in the warrant's validity, for if the magistrate acted reasonably (even if erroneously) then so did the officer.   But, the circumstances under which an officer might have good faith are not limited to situations where "the affidavit presents enough evidence to create disagreement among reasonable jurists as to the existence of probable cause."  *Taxacher*, 902 F.2d at 871.  "*Leon* did not establish a 'reasonable jurist' test as the threshold" for evaluating an officer's good faith, "because a reasonable jurist has more legal training than a reasonably well-trained officer." *Id*. at 872.  Thus the detective may have had a good faith belief that the warrant was valid even if there was no substantial basis for the magistrate's probable cause finding.

The Court has no difficulty in concluding that Det. Rodriguez had such a reasonable good faith belief that the magistrate had issued a valid warrant to search all of the dwellings and vehicles on Pablo Rangel's property.  The detective had acquired evidence from multiple witnesses that Pablo had orchestrated the murder of Montoya, and he had been furnished documentation showing that Pablo had a powerful motive to do so.  Pablo had a nephew who worked with the murder victim.  That nephew not only lived in an unspecified trailer[6] on Pablo's 26-acre property but had a criminal record reflecting the prior possession of a pistol that might have served as the murder weapon.  The detective had been assured by local deputies that 275 Milton Rahn Road served as the address for all of the dwellings on Pablo's property.   Once he accumulated this evidence Det. Rodriguez conferred with both his superiors and an assistant district attorney, who agreed that the probable cause threshold was met.   "These steps are indicative of objective good faith."  *Id.* at 872.  A well-trained officer could reasonably have assumed that this warrant met Fourth Amendment standards.

---

[6]   Det. Rodriguez testified at the suppression hearing that, during his interview, Joel Reyes had revealed only that Refugio Ramirez lived in "a trailer" on Pablo's land. Reyes had been able to furnish a more precise description of that dwelling, however.

**D.    Statements Made to Law Enforcement**

Defendant's only contention regarding his later-made statements to law enforcement is that they must be suppressed as the fruit of an illegal search (*i.e.*, that they would never have been elicited but for the search).  Doc. 27 at 4-5.  For the reasons set forth above, however, the search met Fourth Amendment standards, and therefore his statements were not the product of an illegal search.

## III.    CONCLUSION

Defendant has shown neither that the warrant insufficiently particularized the places to be searched or that the issuing magistrate lacked a substantial basis for her probable cause determination.  But even assuming such deficiencies, this warrant stands, for the executing officer had an objective, good faith belief that the magistrate had properly found that the warrant was both technically sufficient and adequately supported by probable cause.  His challenge to his statements made during his interview several days after the search is therefore moot.  Hence, defendant's suppression motion fails.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C.

§ 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this  18th  day of January, 2018.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA